Next case this morning is 522-0108 People v. Perkins. Arguing for the defendant appellant is Amanda Ingram. Arguing for the state is Richard London. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. We'll first hear from the appellant. Please state your name and you may proceed. Amanda Ingram Good morning, your honors, counsel, and may it please the court. My name is Amanda Ingram and I represent Terrence Perkins. The question here today is whether Perkins' statements to the arresting officers were sufficient to sustain a conviction for threatening a public official under subsection A-5. While Perkins' comments were loud, angry, profane, offensive, they did not contain specific unique threats which are required to prove a threat against a sworn law enforcement officer. For those reasons, Perkins asks this court to reverse his convictions outright. When the state seeks to obtain a conviction for threatening a public official and the public official in question is a sworn law enforcement officer, the requirements to obtain that conviction are higher than for other public officials. The legislature recognized that police, due to the nature of their work, face verbal confrontations and encounters with the public more frequently than other public officials. Some of these encounters may result in verbal confrontations and altercations and some of those encounters will inevitably contain language that is profane and offensive. By providing these heightened requirements for threatening a law enforcement officer, the legislature signaled that not every single angry verbal encounter between a citizen and a police officer will qualify as threatening a public official. Subsection A-2 does not prohibit general threats of harm to an individual officer. Instead, it prohibits threats that contain specific facts indicative of a unique threat to the person, family, or property of the officer. What happened? The defendant in this case, it seems to me, made specific threats. He threatened to punch the officer. He threatened to bring people back the next day. He threatened to kick out the window. But he also said, I know you're a cop and I'm not stupid, but I have not seen the video yet. Is there something from the video that supports your position that this was not a serious threat? If you take all of the comments in the context of what you were made, he did start out saying that he wanted to punch the officer in the face because he wanted the officer to feel the pain that he was feeling because the was because he said, because I want your face to feel like my wrists. And all of these comments, again, he was also saying the police think that they are something and I can sit here and talk about you all night. So within the context of all these comments, he also stated that I can say what I'm going to say, but am I going to do it? I'm not stupid. This is clear hyperbole when he's talking about going to get 50 people, all of that. First of all, that came after he said, I can say what I want to say. I'm not stupid. He is speaking in hyperbole. He's clearly agitated. He's very angry. He believes he's been wrongfully arrested. Pardon me, your honors and counsel. All of these statements were in the context of him believing he's been wrongfully arrested. He's in the back of the car. It's in a brief period of time. I understand his position now is that I was only joking or I was just trying to get a rise out of the officers, but then we don't have to view this in the context of his demeanor and his loudness, that type thing. Isn't the video going to be important to this case? Absolutely. Yes. We definitely should watch the video and see for yourself that he is. It's clear from the video that he's extremely angry. He's highly agitated. He's very upset and he's loud. He's profane. And he had also been picked up at a bar. So it's entirely possible that alcohol was contributing to his demeanor at the time. But all of this, the comments that he was making were, they were intended to get a rise out of the officer. In fact, at one point he said something about that got your attention. When he made the countdown about peeking out the windows, he noted, pardon me, that he was getting that, oh, now that got your attention, which led to him escalating his rhetoric further because he knew he was getting his attention. So he's definitely escalating his rhetoric. He's angry. He's upset. But these are more in line with specific threats of harm. And again, the reason is because the legislature knew that there would be encounters such as this one where you have an arrestee, a citizen who's extremely angry at his current situation. He's going to be cussing. He's going to be saying these offensive things. But not every single one of those encounters is going to be sufficient to amount to threatening a public official under this particular subsection. Well, let me ask you this. If you agree that the video is important, why do we not defer the trial judge, presumably watch, this was a bench trial, watch the video. Why do we not defer to the trial judge who's in the best position to make that determination? Like I said, I agree that we definitely should watch the video. But this court has its own eyes and ears. This court is just as able to view the same video that the trial court viewed. The facts are undisputed. There's no doubt about the specific words that Mr. Perkins said. There's no question about the order in which he said them. And there's really no question about his demeanor. He's clearly very angry. He's very highly agitated. He believes he's been wrongfully arrested. So yes, this court can and should watch the video and see if it is more in line with the general threats of harm brought forth by a citizen who is extremely angry and agitated, or if these are in fact specific threats, which again, I do not believe the video demonstrates that. This is an angry man. He's detained. He's in the back of the car. And it's worth noting that the original basis for his arrest was eventually dropped by the state. He was right that these charges that they originally got him on were not going to be sufficient to go anywhere with. And again, the legislature, when they're making these heightened requirements, part of that is not wanting to give police officers the ability to sort of manufacture additional charges every single time somebody cusses at them from the or are empowered to abuse the police in any way. But this is just a nature of the work of policing is that they're going to be there in this front public forward facing position where they're going to have encounters with citizens. They're going to have to arrest people. And some of those arrest encounters are going to be unpleasant. I'm sure it was extremely annoying for the officer to have this very loud man in the back of his car. Counselee threatened to drop him. Again, this is this was after he's saying, I can talk about you all day, I can talk about you all night. This is it. This is in the context of him saying that he can make these hyperbolic and almost absurd level of statements in an effort to get a rise out of it. But that's not an actual unique and specific threat. That's again, that's more like the generic threat that was in in Williams, where in that case, the defendant said, I'll catch you off duty. It's a very similar kind of statement where it's like that is a general threat of harm. It's not a specific threat. Well, didn't he make a specific threat that he was going to get 50 individuals in return the next day? He did say that again. So that means nothing. It's not that it means nothing. But again, when you take it into the entire context, the comments about bringing 50 people back the next day was after he recognized first of all, it was after he said, I can say what I'm going to say, but I'm not am I going to do it? I'm not stupid. So he's already signaled that he's just full. That's this is still within the context. Did he say something before that he wasn't going to do it? I'm not going to bring 50 people here. But tomorrow, I'm not going to bring 50 people. What did you say? He said he was going to and again, this is after when he did the countdown for the windows. And he noted he said, was it not true that the people that heard that were police officers in the station? And they didn't weren't in the car. My recollection is that this happened while he was still in the car. Okay, I apologize. I think he was still in the car at that point. In the station. I know he said I hate you to the officers. But that I do not think is clearly that would not be a unique or specific threat in this case. The comments about bringing 50 people back was after he realized that when he said he was going to kick the windows out that it the officer's attention, and he was and he felt that the officer was like waiting on him to do something. So he is escalating his rhetoric. Your Honors, I see that my time is up. May I briefly conclude? Briefly, because you'll have rebuttal. Okay, there's no question that Mr. Perkins was highly agitated and angry, but none of his statements in this case amounted to a specific and unique threat under subsection eight five. Thank you. Any questions just as well? No other questions. Thank you, Justice Welch. No, no further questions. Council for happily, please state your name and you may proceed. Morning, Your Honors Council may please the court. My name is Richard London, on behalf of the people of the state of Illinois. Your Honors, the people agree that the only question is whether the threat contains specific facts indicative of a unique threat to satisfy the requirements of a five. Defendant contends both in the brief and during oral argument today, that the threats should in essence be excused, because they were general. He was angry, he was joking. He may have been alcohol may have been involved. But but that he qualified them. With all due respect, there's there's no anger exception to the statute. There's no oops exception. There's no alcohol exception. Anger does not excuse threats. Threats are typically made when one is angry. Threats are typically made when one is intoxicated. If the threat or if the comments or the cussing or the profanity simply included, as counsel indicated, the I hate you type of comment, which of course was not charged, that would be in the nature of a general comment. I'm going to get you, which is similar to people versus die would be in the nature of a general threat. Does I get you mean I'm going to get you mean I'm going to carry out a violent act, or I'm going to sue you or sue the department. That's a general threat. That's not what we had here. We had specific and unique threats. Um, as we suggested in our brief, we do not believe that this court is required to or should follow people versus Williams. However, even if this court were to decide that people versus Williams was correctly decided, the court in Williams said a similar comment to an officer that I'm going to F you up was not sufficient. Why? Because it didn't give specifics. Was that meaning they were going to punch him? They were going to shoot him. They were going to stab him. Uh, the people believe that that is sufficient. I'm going to F you up is a sufficient threat of physical violence. Regardless, even in Williams, the court said if we had something more, if we had the head, but referenced in people versus Warrington, that would be a specific example of violence that would be a specific and unique threat. In this case, we had those specific and unique threats. We have the type of harm and we had how and when defended intended to inflict it. Defendant gave a specific time and location. It was going to be as soon as he got out of jail. The next morning he was coming back with 50 people. And even if that's hyperbole, he was coming back with a number of people to get the officer. And more specifically, he was going to get him by doing one of two or more than he was going to drop him, which the officer testified meant to shoot and generally kill. That is a very specific and unique threat. He also threatened to punch him in the face. That is very similar to the headbutt language. The headbutt language was also, I could headbutt you. I might headbutt you. He obviously didn't headbutt him in Warrington. If we had the actual act, we wouldn't have a threat. We'd have the offense of assault, battery, attempt murder, possibly murder. They actually shot him. Here we have specific and unique threats that are not excused by, I was angry, I was upset. If we had that language, if we had, I'm going to get you, possibly if we even had, I'm going to F you up, that could be considered general. Certainly, I'm going to get you might be general. The Port and Williams found I'm going to F you up was general. However, the headbutt in that case, or as they referenced from Warrington, or here, the punch, or indeed the I'm going to drop you, I shoot and possibly kill you, or at least attempt to do so, is specific and unique. Counsel, what is the state's position on the standard of review in this case? Standard review should be discretion, should be giving the lower court discretion. Why? Not only did the court view or listen to the video, which obviously this court can do, but also heard the testimony of the officer. It was able to judge the credibility of the officer and whether both that officer and a reasonable officer would have viewed these threats as real, as specific and unique. This court can listen to defendant's statements, but doesn't have the ability to see the context of the officer's testimony as well. Isn't this essentially a sufficiency? It is. It is. And the question is whether any finder of fact could have found the facts of defendant guilty. We also have, and I will briefly discuss, count four. In count four, we also have specific and unique facts. Defendant didn't say, you know, I'm going to trash your car, which again could be considered general. We have defendants saying, I'm going to kick the windows out. The officer testified that one, the audible thumps that are heard on the tape were when defendant was indeed kicking parts of the interior of his car. And two, testified that due to defendant's build, height and weight, that he believed that those threats were the officer had noted during his testimony that the car that he was driving did not have bars or any type of protection that some of the other squad cars would have. So therefore, the officer was both concerned, believed the threat was credible, and those threats were height and weight. There isn't, as far as I'm aware. Again, I can't swear that it's not. I do not believe so. But we have the testimony of the officer that is unrebutted. Mr. London, the trial judge noted in his ruling that the facts were not in dispute. So isn't this then a question of law, which will be reviewed de novo? I think he said the facts were not in of those comments. And the credibility of the officer, I guess, are in dispute. Certainly the credibility of the officer testifying is in dispute. And again, as a sufficiency of the evidence case, the reasonableness of the finder of fact and his judging of both the context and credibility are not de novo. Thank you. In closing, your honors, the facts here were specific. They were unique. The defendant, whether angry, and again, we agree with counsel that people arrested are often angry, especially maybe in a bar, there's alcohol involved, but general anger, general, I'm going to get you or I'm going to sue you or you're a jerk, that does not justify the specific threats made in this case. We also do not agree with the concept that, well, defendant was because those charges were dropped. We all know that if you have more serious charges that are raised, in this case, threats to the police officer, there are often, you know, circumstances where others' charge are nullied or are not pursued for various reasons. For these reasons, because the threats were specific, direct, and satisfied subsection A-5 of the statute, we'd ask that this court affirm both convictions. Thank you. Any questions, Justice Vaughn? No other questions, thank you. Justice Welch? No questions. Rebuttal. Just a few points in rebuttal, your honors. First of all, with regard to the standard of review, the entire basis for these charges is contained within the video surveillance, from the car ride to the body camera that was inside of the police station. So this isn't a similar situation where we are relying on a particular witness's testimony to describe what happened or to understand what happened. We know what happened because we can all watch it on the video. Second of all, the state seems to equate the- It doesn't affect the standard of review, however, does it? I'm sorry, your honor, what was that? We're reviewing the case after a finding of guilty, and we still give the deference to the finder of fact, and it's essentially a sufficiency standard that's been raised. A sufficiency of the evidence challenge that has been made. Right. But in a case such as this, where the facts are simply not in dispute, and we have the benefit of the camera and the video that this court can watch just as easy as the trial court did, those facts are not in dispute. So that lends us to this being, as a matter of law, do these facts arise to a threat to a public official under subsection A-5? The state seems to equate the headbutt in Warrington with the threat to punch in the face. And I think there are some distinguishing factors in that. For one, again, the punch in the face comment was right in the beginning. He was irritated with his wrist. He said he wanted his face to feel like his wrists, which were apparently in a great deal of pain. Also, at the time he made this statement, he was restrained with the handcuffs in the back of the car. So he had no way to execute on this desire to punch him in the face. While in Warrington, if I'm not mistaken, that comment about headbutting was made when they were walking together, and he potentially could have gone out of his way to headbutt the officer in that moment. He was in a time and space when could have done that. Third, again, the time and location about tomorrow I'm going to bring 50 people back. This is hyperbole, and it's almost absurd to think that there would be 50 like-minded individuals that he could gather within hours to come back to the station and do this. And it's not that there's an excuse for being angry. But again, the legislature, when it created these heightened standards, knew that there's going to be angry encounters with the police. There's going to be profane language used. And that has to be more than that. It has to be more than that in order to rise to the level of a threat to a public official when the public official is a sworn law enforcement officer. Again- There was no way to do that to a police officer, was there? No exception, except for police officers. Subsection A-5 is specifically targeted to law enforcement officers. So, for example, another public official, you may, to have like a general threat, for example, I think in Warren, there were threats against a divorce court judge or a family court judge. Those threats were for that purpose. But police officers, again, the legislature knows that police, they are forward-facing. They have daily encounters with the public. They understand that some of these encounters are going to be angry. They're going to be profane. And they didn't have any intention of every single time we have an angry encounter between a citizen and a police officer, that that citizen is going to face charges of threatening a public official. So, it's just, we have to take the entire context of this, where he's restrained, he's in the back of the car, he is very angry. These are generic threats. He's speaking in hyperbole. He's trying to get a rise out of the officer. But these are not specific, unique threats that are sufficient under subsection A-5. Just briefly, the point about kicking out the windows. I mean, he's a, maybe he was a big guy, but it's, again, this is almost absurd to think that a man who is Hancock, and yes, he's knocking around in the back of the seat, he's shouting, he's angry, but it would really take some form of physical gymnastics and fitness to be able to position himself in order to kick out the window. And again, when he said he was going to, when he did his countdown to kick out the window, he immediately followed that with, I can say what I'm going to say. I'm not stupid. I'm not going to, am I going to do it? I'm not stupid. So, I see my time has concluded, Your Honors. With that, none of Perkins' statements, as rude as they were, qualified as a unique threat sufficient to sustain this conviction. And we ask you to reverse his convictions outright. Thank you. Any questions, Justice Vaughn? No other questions. Thank you. Justice Welch? No questions. We'll take the matter under advisement and issue our decision in due course. Thank you, counsel.